EAG:NEM
F.#2015R0888

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                          15-CR-628 (CBA)

     - against -

QIAN ZHENG,
     also known as "Cash,"
GUIFU GAO,
     also known as "Chicken Feather,"
XIN LIN,
     also known as "Blackie,"
KAI HUAN HUANG,
     also known as "Shen Shen,"
BILLY CHEN,
     also known as "Lo Di," and
XUE JIANG GAO,
     also known as "Xue Zhang,"

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION</u>

                             ROBERT L. CAPERS
                             UNITED STATES ATTORNEY
                             Eastern District of New York
                             271 Cadman Plaza East
                             Brooklyn, New York 11201

Nadia E. Moore
Assistant U.S. Attorney
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of the pretrial detention of Qian Zheng, also known as "Cash," Xin Lin, also known as "Blackie," Guifu Gao, also known as "Chicken Feather," Kai Huan Huang, also known as "Shen Shen," Xue Jiang Gao, also known as "Xue Zhang," and Billy Chen, also known as "Lo Di." The government reserves the right to seek a permanent order of detention as to the remaining defendants, Jiyao Jiang, also known as "Yi Qiang," and Allen Hui Chen, also known as "Yi Hui."  The defendants are members and associates of the Zheng Organization, a violent gang, and have committed crimes including racketeering and racketeering conspiracy, narcotics offenses, extortion, operating and illegal gambling business, and have solicited, attempted and conspired to commit assaults in aid of racketeering.  For the reasons set forth below, permanent orders of detention should be issued as to all of them.

DISCUSSION

I.      Factual Background

As alleged in the Indictment, the defendants are members and associates of the Zheng Organization, and have committed the following crimes.

A.      Racketeering Conspiracy

The Zheng Organization is a gang comprised primarily of individuals operating in and around the Flushing neighborhood of Queens and the Sunset Park neighborhood of Brooklyn.  Members and associates of the Zheng Organization have engaged in drug trafficking, operating an illegal gambling business, extortion, and acts of violence, including assault, as well as other crimes.

1

B.     Crimes of Violence

1.     Assault Solicitation and Attempt – John Doe 3, Jane Doe

In or about August 2013 the defendant Qian Zheng told two cooperating witnesses (defined herein as "CW1" and "CW2") to do a "job" for him.  Zheng explained that he had been hired to assault John Doe 3 and Jane Doe due to a dispute.  In a recorded conversation, Zheng explained that "someone asks me to . . . uh . . . get somebody to hire two or three kids, to beat up somebody."  Zheng then explained that CW1 and CW2 should get "two or three" "black guys" to do the beating.

In other recorded conversations, Zheng provided CW1 and CW2 with the address of the targets' shop as well as their home address.  Zheng described where the targets were from in China, and their daily routines.  Zheng instructed CW1 and CW2 to tell the "black guys" to "beat them.  Break their legs."  In another recorded conversation, when CW1 confirmed with Zheng that he wanted to have the targets beaten and their legs broken, Zheng responded "break his leg.  Scar, scar the girl's face."

CW1 and CW2 did not in fact assault John Doe 3 or Jane Doe, but told Zheng that they did.  In another recorded conversation Zheng provided CW1 and CW2 with $2,000 for the assault and instructed them to give the money to the "black guys."

In August 2015, Zheng called a New York City Police detective and told him that he had done some "bad things."  These "bad things," included being hired by a female friend to teach her boyfriend a lesson.  Zheng admitted that he introduced her to CW1 and that she paid CW1 approximately $5,000 – $10,000 to hire a black guy to assault her boyfriend in Brooklyn.

Evidence of this crime includes cooperating witness testimony, recorded conversations, photographic evidence, and Zheng's statements to the NYPD.  Notably, the

recorded conversations clearly document every step of Zheng's plan to have John Doe 3 and Jane Doe assaulted, including soliciting CW1 and CW2 for the job, providing them with information to identify the targets – including driving them to the targets' house – noting how he wanted the targets assaulted and paying them for the assault.   Based on these facts, the Indictment charges Zheng with soliciting the assault in aid of racketeering of John Doe 3 and Jane Doe and attempting to commit the assault in aid or racketeering of John Doe 3 and Jane Doe.

2.   Extortion Conspiracy / Extortionate Collection of Credit Conspiracy – John Doe 1

In approximately December 2013 Zheng approached CW1 and CW2 about another "job."   He told them that a restaurant owner in upstate New York owed "money club"[1] money to a friend.   He explained that he wanted them to hire a few "black guys" to shoot up the restaurant.   A few days later he took them and Billy Chen, also known as "Lo Di," upstate in his Mercedes SUV to show them the target.   They went to the target's restaurant and ate.   After they determined that the target was not there, they went to his house.   Shortly after arriving at the target's house, the target got into his car, blocked Zheng's SUV in and called the police.   The police spoke with Zheng but let him go.   Zheng then explained that it would be best to hold off on the job because the police had his information.

Based on these facts, the indictment alleges in Racketeering Acts 2(a) and 2(b) and charges in Count Six that Zheng and Chen conspired to collect an extension of credit through extortion, and conspired to commit extortion.   Evidence of this crime includes cooperating

---

[1]   A money club consists of a group of people.  Each month, or other specified period of time, every member is expected to contribute a set amount of money.  This provides the monthly capital for the money club.  Each month, each member can bid if they wish to take the loan from the money club.  The winner will receive the pot.  The next month, each member will pay into the money club, and the individual who won the previous pot will pay his monthly share as well as a portion of the loan that he previously received.

witness testimony, law enforcement testimony and records, EZ-Pass records, surveillance footage, and 911 calls.    Notably, recorded conversations capture Zheng explaining his intent to collect an extension of credit through extortion.   For instance, one recording included the following:

| | |
|---|---|
| ZHENG: | You . . . can you find some black guys? |
| CW1: | Huh?  You mean the ones from last time? |
| ZHENG: | Yeah |
| CW1: | I can find them. |
| ZHENG: | You can find them.  Call them and pick a day, take them upstate to get a job done. . . . Someone there owes, owes . . . money.  Don't tell the black guys how much he owes. |
| CW1: | Okay. |
| ZHENG: | He owes hundreds of thousands of dollars. |
| . . . | |
| CW1: | So . . . you want the black guys to go up there, what do you want them to do? |
| ZHENG: | Don't do anything yet.  Just go lurking around. . . . Go up there, just go . . . go . . . go to his restaurant. . . . [He] owes . . . owes $200,000 to $300,000 from taking the auction pot of a money club.   . . . Make him pay. |
| CW1: | Oh.  Okay. |
| ZHENG: | You understand? |
| CW1: | Sure. |
| ZHENG: | Make him . . . otherwise . . . beat him up. |

Later, Zheng explained:

Today we come up here to talk nicely.  We won't do anything.  You

know? . . . Next time, these kids will go there themselves.  They will take a gun, fire two rounds and leave.  We go back to talk to him then.  "Do you want to settle?  If you don't resolve this, we will come back here every day.  The next time, it won't be the same."

Zheng also told CW1 and CW2 to "Punch him first.  It's okay to punch him.  He owes money.  Let him call the police.  Probably need to punch him first.  He probably needs to be beaten first.  Otherwise he won't pay any money."

Chen similarly explained that they should recover the money through violence and threats of violence:

| | |
|---|---|
| CHEN: | I am thinking to do the following.  Can you see if this is good?  Tomorrow, we will go to his apartment. |
| ZHENG: | Oh. |
| CHEN: | Perhaps you get somebody to smash his car first. |
| ZHENG: | Oh. |
| CHEN: | Like that, at the door. |
| ZHENG: | Oh. |
| CHEN: | "So, your car is smashed."  If he is not scared . . . if I . . . perhaps many people know about his restaurant.  They don't know about his house. |
| ZHENG: | Oh. |
| CHEN: | His house. |
| ZHENG: | Oh. |
| CHEN: | He parks his car by his house. |
| ZHENG: | Oh. |
| CHEN: | Smash his car. |

ZHENG:              That's fine.

CHEN:               Then I'll call him at night, "if you still don't wire the money, people will be sent to your apartment to talk to you."

3.   <u>Assault Solicitation, Attempt and Conspiracy – John Doe 4</u>

In approximately October 2014 Zheng introduced Guifu Gao, also known as "Chicken Feather," to CW1 so that CW1 could do a "job" for him.  Gao explained that John Doe 4 had taken money from him and he wanted him beaten.  CW1 explained that he would hire a few "black guys" to do the beating.  CW1 did not have John Doe 4 beaten, but told Gao that he had, and John Doe 4 pretended to be injured.  Gao, unsatisfied with the results of the beating, had John Doe 4 beaten again.  Still unsatisfied, Gao again asked CW1 to have John Doe 4 beaten.

In August 2015 Zheng told an NYPD detective that an Asian male friend of his who owns a nail salon in Brooklyn[2] approached him to recover $30,300 from an Asian male employee[3] who was supposed to transfer the money to China but did not.  Zheng told the detective that he introduced his friend to CW1.  After a few days Zheng's friend told Zheng that the nail salon employee had gone back to work with no signs of injury and that CW1 had tricked him.  Zheng claimed that CW1 told him that his Asian male friend who had hired him to get the money back from the nail salon employee wanted him to kill the nail salon employee with a gun.

Based on these facts, the indictment charges in Counts Eleven, Twelve and Thirteen that Zheng and Gao solicited, attempted and conspired to commit an assault in aid of racketeering.  Evidence of these crimes includes cooperating witness testimony, eyewitness

---

[2]   Gao is the registered CEO with the New York State Department of State Division of Corporations of New Ann's Nail Design Inc. in Brooklyn.

[3]   John Doe 4 previously worked for Gao at his nail salon.

testimony, law enforcement testimony, recorded conversations, text messages and Zheng's statements to the NYPD.

Notably, recorded conversations capture Gao soliciting the assault, explaining in detail how he wanted the assault carried out and providing payment for the assault. In one such recording from October 30, 2014, Gao explained how he wanted John Doe 4 beaten:

| | |
|---|---|
| GAO: | What do you need me to provide? |
| CW1: | Huh? |
| GAO: | I mean . . . that . . . |
| CW1: | The boss . . . I don't know . . . The boss said you would fill me in. |
| GAO: | The boss said that? Right . . . the boss . . . I want to get this fucking kid beat up. |
| CW1: | Who? |
| GAO: | A fucking kid. A nobody. I . . . I gave him some money to send. |
| CW1: | Oh. |
| GAO: | There were some old involvements with other people. So [I] gave him some money to send but he withheld some. |
| CW1: | Oh. |
| GAO: | It's being withheld and he drags it out day after day. I feel . . . |
| CW1: | Oh. How much does he owe you? |
| GAO: | $15,000. |
| | . . . |
| CW1: | How do you want it done? |

GAO:    How do I want it done?  How about . . . beat him . . beat him . . beat him until he is half dead.  Fuck him.

CW1:    That's fine.  See how you want him beaten, I'll arrange the kids to get it done.

GAO:    Oh.  This way, on our side, the boss spoke to me.  He wanted me to tell you the specifics.  He said to see how much money you would charge.

CW1:    Oh.

GAO:    Everyone needs money to get things done, right?

CW1:    Yeah . . . we are so close to each other.  You tell me how much.  I don't know.

GAO:    You tell him it's fine.  The boss and us . . . it's no problem.

The recordings also reveal that Zheng provided oversight of the assault.  For instance, in a recorded conversation from November 6, 2014, Zheng checked in with CW1 about the status of the job for Gao, and asked him "Can you take care of this thing for Chicken Feather Duster?"

The following conversation was recorded on December 25, 2014:

GAO:    Let me tell you, I also spoke with the boss last time.  The boss said okay.  The boss said he would talk to you.  Fuck, it hasn't even been . . . I said.  We fucking said that we wanted it done severely.  The black guys probably only fucking waved around [the bats] sloppily.  It hasn't even been a few fucking days. He went back to the store already.   Like nothing ever happened.

CW1:    Oh.

GAO:    I even charged into his store to push him already, you know?

8

| | |
|---|---|
| CW1: | Oh. Okay. |
| GAO: | Yeah.  This time, let me tell you, you should see to arrange it for me.  Anyway, we are friends okay.  It's okay.  See if you can stab his legs twice for me. |
| CW1: | Stab his legs twice? |
| GAO: | Yeah. |
| . . . | |
| GAO: | This time you should . . . break his legs for me. |

In this conversation, Gao complained to CW1 that the employee had not be satisfactorily beaten and was able to go back to work because he was uninjured.  ("We fucking said that we wanted it done severely.  The black guys probably only fucking waved around [the bats] sloppily.  It hasn't even been a few fucking days. He went back to the store already.  Like nothing ever happened.")  In fact, Gao was so unsatisfied that he and another individual beat the employee themselves.  ("I even charged into his store to push him already, you know?").  Gao instructed CW1 that he needed to either stab the employee or break his legs.  ("See if you can stab his legs twice for me.  . . . This time you should . . . break his legs for me.").

In a recorded conversation from January 5, 2015, CW1 called Zheng and explained that the job was done but that Gao hadn't paid him yet.  He explained that while Gao was supposed to pay him the night before, he told him to call Zheng first.

On January 6, 2015, in another recorded conversation CW1 explained to Gao that the beating had taken place, and Gao paid CW1 $5,000.  Gao explained that once he verified the beating he would pay CW1 the rest of the money.  Gao explained that "he needs to be disabled. . . . Make him crippled, make him handicapped."

Zheng was again recorded discussing whether CW1 had carried out the beating

9

satisfactorily:

| | |
|---|---|
| ZHENG: | Oh, this is . . . about Chicken Feather. . . . How did you do the deal for him?  Didn't he say . . . |
| CW1: | No, I did . . . |
| ZHENG: | . . . there was not a bit of injury from the beating. |
| CW1: | There were injuries.  Last time didn't I sent . . . |
| ZHENG: | The first beating was alright.  The second time there wasn't any injury. |
| CW1: | Didn't I send you the video last time? |
| ZHENG: | Yeah. |
| CW1: | Right?  I told you.  The beating . . . Now he . . . he told me to get the black guys to go there to fire two shots. |
| . . . | |
| CW1: | I mean this thing with Chicken Feather Duster, what if he doesn't pay the money? |
| ZHENG: | You can talk to him first. |
| CW1: | I did talk to him.  He told me, "It's okay, brother, it's not a problem."  He said he followed you, his boss, for over ten years, you know?  He said it's not a problem.  I said . . . |
| ZHENG: | Money is not a problem.  It was because [he] saw that you didn't take care of business well.  He did tell me the other day.  He told you to break a leg.  The leg wasn't broken. |

In this conversation, Zheng expressed knowledge that Gao hired CW1 to do a beating and that he sent him to beat the target on two occasions.  ("The first beating was alright. The second time there wasn't any injury.")  Furthermore, Zheng explained that CW1 would be paid for the assaults, but only once they were satisfied with the results.  ("Money is not a problem.  It was because [he] saw that you didn't take care of business well.  He did tell me the

10

other day.  He told you to break a leg.  The leg wasn't broken.")

In the following recorded conversation from in April 2015, Gao informed CW1 that Zheng has given CW1 the okay to go ahead with the assault:

| | |
|---|---|
| GAO: | Did [the black guys hired to do the beating] come back? |
| CW1: | Those people.  They'll be back in a day to two. |
| GAO: | They'll be back in a day or two? |
| CW1: | Yeah. |
| GAO: | Okay, okay.  Hurry up, brother.  I kept waiting for you. |
| CW1: | Okay.  Did you tell the, the boss? |
| GAO: | I did.  I did. |
| CW1: | What did the boss say? |
| GAO: | The boss said okay.  He wants you to go ahead. |

In another recorded conversation from April 28, 2015 Zheng told CW1 "That motherfucker is not scared after getting beaten.  Motherfucker, keep beating him . . . maybe he wasn't beaten serious enough! . . . Beat him in front of his house at night.  Beat him hard."

### 4.   Attempted Extortion / Extortion Conspiracy – John Doe 2

On May 28, 2015, a group of approximately 7 or 8 Chinese men came into John Doe 2's gambling parlor asking for him.  Xin Lin, also known as "Blackie" claimed that John Doe 2 owed money and demanded that he repay it.  John Doe 2 refused because he did not owe any money.  Lin, Kai Huan Huang, also known as "Shen Shen," and Xue Jiang Gao, also known as "Xue Zhang," began beating him with their hands and with wooden stools.  The other men smashed the tables, chairs, and televisions in the gambling parlor.  A pregnant woman who was

present during the beating called 911 and reported the beating.  Before leaving, Lin told John Doe 2 that if he didn't pay the money he would be back in three days to trash the parlor again.  Photographs of the parlor after this incident are attached hereto as Exhibit A.  John Doe 2 suffered bruising and swelling, and a broken bone in his hand.  A photograph of his swollen hand after the assault is attached hereto as Exhibit B.  After this incident two Asian men came and spoke with John Doe 2 and told him not to report what had happened to the police and their dai lo[4] would take care of everything.  They told him that their dai lo was Cash.  Cash is Zheng's alias.

On June 1, 2015 Zheng called an NYPD Detective.  Zheng told him that there had been a disturbance on May 29, 2015 in the 66th Precinct at a gambling parlor.  Zheng explained that the owner of the parlor borrowed $10,000 from Zheng's female friend's money club and agreed to pay that amount back by paying $500 a week.  Zheng sent several individuals to the gambling parlor to inquire about the owed money.  The conversation got heated and Zheng's friends slapped the gambling parlor owner and overturned one of his gambling tables.

Based on these facts, the indictment alleges in Racketeering Act Four, that Zheng conspired to and attempted to extort John Doe 2, and charges in Counts 7 and 8 that Zheng, Lin, Huang and Jiang Gao conspired to and attempted to extort John Doe 2.  The evidence of these crimes includes eyewitness testimony, 911 calls, photographic evidence, medical records and Zheng's statements to the NYPD.

C.    Narcotics Offenses

Zheng and Hui Chen are charged with narcotics distribution and conspiring to

---

[4]    Dai lo literally translates as "big brother" but is a term used to refer to the boss of a criminal gang.

distribute narcotics in Counts Three and Four.  Zheng is also charged with narcotics distribution in Racketeering Act One and Count Two.  The evidence of these crimes includes eyewitness testimony, physical evidence – including seized MDMA, law enforcement testimony and consensually recorded conversations.  Notably, in recorded conversations Zheng approached CW2 and asked him if he could sell drugs for him, explained that the drug CW2 sold for him contained ecstasy, and received with $1,000 from CW2 that were represented to be the proceeds of the drug sales.  Similarly, in recorded conversations Hui Chen provided CW2 with narcotics and explained how to prepare the drug for consumption and how much to charge for it.

  D. <u>Operating an Illegal Gambling Business</u>

   Zheng ran a high stakes gambling game last winter located at 5917 7th Avenue in Brooklyn.  Zheng asked CW2 if he would serve as a dealer for him.  CW2 agreed.  He dealt poker for approximately 34 hours.  The high stakes game lasted approximately 36 hours.  In addition to CW2 there were a number of other dealers at the game, security guards and accountants.  Zheng later paid CW2 $1,000 for his work.  Zheng also explained that he had grossed over $70,000 from the high stakes game, and that, after expenses, he had made $60,000.  Based on these facts the indictment alleges in Racketeering Act Three and Count Seven that Zheng operated an illegal gambling business.  The evidence of the crime includes, cooperating witness testimony and photographs.

II. <u>Legal Standard</u>

  A. <u>The Bail Reform Act</u>

   Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et</u> <u>seq.</u>, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e) (detention warranted

where "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

B.    Presumption Cases

Under the Bail Reform Act, a presumption of both flight and dangerousness arises when there is probable cause to believe that the defendant committed, "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act."  18 U.S.C. § 3142(e)(3)(A).  Probable cause may be established by an indictment, such that there is no need for the judge to make an independent probable cause determination.  See United States v. Artis, 607 Fed. Appx. 95, 96 (2d Cir. 2015) ("An indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)").  Zheng is charged by indictment with three narcotics trafficking offenses, each of which carries a maximum term of imprisonment of at least ten years.

Where a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness.  United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).  Regardless of whether the presumption applies, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community.  Mercedes, 254 F.3d at 436.

C.     Danger to the Community

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Indeed – and significantly – danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  In addition – and also significantly – when a finding of dangerousness is related to violent conduct, it need not be shown that the defendant personally engaged in violence.  United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985).

D.     Proceeding by Proffer

Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed

15

by proffer in detention hearings; <u>Ferranti</u>, 66 F.3d at 542 (same) <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination.  Most proceed on proffers.  <u>See United States v. LaFontaine</u>, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  <u>United States v. Acevedo-Ramos</u>, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in <u>LaFontaine</u>, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  <u>Id.</u>

<u>United States v. Abuhamra</u>, 389 F.3d 309, 320 N.7 (2d Cir. 2004).

      E.     <u>Elaborate Bail Packages Are Insufficient to Protection the Community Against Violent Defendants</u>

     The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release.  In <u>United States v. Millan</u>, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted).  <u>See</u> <u>also</u> <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted); <u>see also</u> <u>United States v. Tortora</u>, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be

forthcoming).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.   See e.g., United States v. Cantarella, No. CR02-0307, 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 883 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the community, given the ease with which many of them may be circumvented").

IV.     APPLICATION

A.     QIAN ZHENG, also known as "Cash"

1.   Zheng Constitutes A Danger to the Community and Should Be Detained

Zheng poses a danger to the community because of his participation in numerous assaults and extortions, and in distributing MDMA and ketamine.   In light of the MDMA and ketamine distribution charges, Zheng is presumed to pose a danger to the community.   18 U.S.C. § 3142(e)(3)(A).   Given that each of the § 3142(g) factors weighs heavily in favor of detention, the defendant will be unable to defeat this presumption.

i.  The Nature and Circumstances of the Crimes Charged

As set forth above, Zheng is charged in all thirteen counts in the indictment, eight of which are crimes of violence.  For these crimes, Zheng faces a maximum sentence of twenty years on Counts One, Three, Four, Five, Seven, and Eight; a maximum sentence of ten years for Counts Two, Nine and Eleven; a maximum sentence of five years on Count Six; and a maximum sentence of three years for Count Ten, Twelve and Thirteen, for a total combined statutory maximum sentence of one hundred and sixty-four years.

The nature of the charged crimes – including drug distribution, soliciting, attempting to and conspiring to commit assaults, extortions and extortionate collection of credit – are extraordinarily serious.  See United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985) ("it is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger' under 18 U.S.C. § 3142(g)."). Taken together they establish that Zheng is an unremorseful and brazen criminal who flouts the law as he commits serious violent crimes.  Accordingly, this factor favors detention.

ii.  The Weight of the Evidence Against Zheng

The evidence of Zheng's guilt is exceedingly strong.  The government will prove the charged crimes through, among other evidence, cooperating witness testimony, eyewitness testimony, cell site records, surveillance footage, medical records, his statements to law enforcement and recorded conversations.  Zheng's participation in the conspiracies to assault John Does 3 and 4 and Jane Doe, the extortion of John Doe 1, and narcotics distribution is beyond dispute given the extensive recorded conversations that he had with cooperating witnesses during the charged periods discussing and soliciting the commission of the crimes. See United States v. Petrov, 604 Fed. Appx. 66, 67 (2d Cir. 2015) (finding that the government

18

submitted clear and convincing evidence that the defendant presented a danger to the community where the government presented recorded threats and text messages that evidenced additional threats.").

Additional evidence that supports these charges includes seized narcotics, cell site data from Zheng's phone corroborating the cooperating witnesses and eyewitness' anticipated testimony which confirms Zheng's participation in the charges crimes.  This factor weighs in favor of detention because evidence of the defendant's guilt is strong.  See United States v. Rounds, 2015 WL 6604007, at *1 (2d Cir. Oct. 30, 2015) (finding that the "gravity of the charges and the strength of the evidence on which [the defendant's] detention was based . . . counsel[s] against release.").

iii.   The History and Characteristics of Zheng

The defendant Zheng has 6 prior arrests including:

- A 1999 arrest for promoting gambling in the second degree and possession of gambling device;

- a 1999 arrest for assault in the second degree with intent to cause physical injury with a weapon and criminal possession of a weapon with intent to use in the fourth degree;

- a 1996 arrest for robbery in the first degree – forcible theft armed with a deadly weapon, criminal possession of a dangerous weapon in the first degree, criminal use of a firearm in the first degree – commit violence, criminal possession of weapon in the third degree – bomb/silencer/machine-gun criminal possession of stolen property in the fifth degree;

19

- a 1996 arrest for criminal possession of a dangerous weapon in the first degree, criminal possession of a weapon in the third degree – defaced for concealment, and criminal possession of stolen property in the fifth degree;

- a 1996 arrest for robbery in the second degree – aided by another; and

- a 1994 arrest for intentional murder, criminal possession of a weapon in the second degree; criminal possession of a weapon in the third degree – prior conviction.

On March 9, 1998, Zheng was convicted of disorderly conduct, after pleading guilty.  This conviction stemmed from his 1996 robbery in the first degree arrest.  He was sentenced to time served.

While Zheng has not been convicted of a crime of violence, the defendant's conduct in relation to the underlying charges shows that he willingly engages in violence.  In soliciting the assault of John Doe 4, Zheng told CW1 in a consensually recorded conversation "[t]hat motherfucker is not scared after getting beaten.  Motherfucker, keep beating him . . . maybe he wasn't beaten serious enough! . . . Beat him in front of his house at night.  Beat him hard."   The defendant also solicited the assault of John Doe 3 and Jane Doe telling CW1 to "break his leg.  Scar, scar the girl's face."   The defendant's willingness to engage in violent conduct supports a finding of dangerousness.  See United States v. Artis, 607 Fed. Appx. 95, 96 (2d Cir. 2015) (finding that defendant's lack of prior criminal record was "not so compelling as to defeat the presumption or manifest clear error in the district court's determination that no combination of release conditions, and specifically not the conditions proposed by [the defendant], could reasonably assure against dangerousness and risk of flight.").

20

iv.   The Danger if Zheng is Released

"[T]he nature and seriousness of the danger to any person or the community that would be posed by the person's release" strongly supports a finding of dangerousness.  Zheng participated in multiple extortions and assault conspiracies, and the only reason that some of the intended assault victims were not seriously injured was because, unbeknownst to Zheng, his targets were alerted to his plans and feigned injury.  One extortion victim was not so lucky and suffered bruising, swelling and a broken bone.  Therefore, the seriousness of the danger posed by release – the risk that the intended victims or others will be injured – could not be higher.

2.   Zheng Poses a Flight Risk and Should Be Detained

In addition to the facts set forth above, Zheng constitutes a substantial flight risk because (1) he faces a maximum term of 164 years' imprisonment; (2) he has a history of putting his interests above those of the community, and (3) has extensive ties to China.

i.   Zheng Faces A Lengthy Prison Term

Based on the charges in the indictment, the defendant faces a maximum term of imprisonment of 164 years.  The government currently estimates that the defendant's sentencing range under the United States Sentencing Guidelines will be 262 – 327 months' imprisonment.  The likelihood of such a lengthy sentence provides a strong motive for the defendant to flee, especially in light of the strength of the evidence in this case.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long . . . a defendant has stronger motives to flee." (citation omitted)).

ii.  <u>The History and Characteristics of the Defendant</u>

The defendant plainly has no respect for the law and would have every incentive to flee, and none to appear as directed by the court.  Nothing about Zheng's history or characteristics should give the court comfort that he will appear as directed, instead they evince a pathological lack of concern for societal norms.

iii.  <u>The Defendant's Ties to China</u>

Since 2009 the defendant has traveled to Hong Kong or Beijing at least seven times.  The defendant's frequent travel and ties to China further increase his risk of flight. <u>United States v. Routollo</u>, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. July 8, 1988) (defendant's frequent travel abroad increased risk of flight); <u>United States v. Solano–Fell</u>, No. 07–CR–6197, 2009 WL 66071, at *2 (W.D.N.Y. Jan. 8, 2009) (defendant's visits to foreign jurisdictions, among other factors, suggested "a significant risk of flight")

B.  <u>Xin Lin, also known as "Blackie"</u>

Lin poses a danger and a flight risk if released.  As set forth above, Lin is charged with a violent extortion in which he beat the victim so hard that he broke a bone in the victim's hand – an extraordinarily serious crime and a crime of violence.  <u>See</u> <u>United States v. Gotti</u>, 219 F. Supp. 2d 296, 297 (E.D.N.Y. 2002) ("[E]xtortion . . . [is a] crime of violence within the meaning of the Bail Reform Act.") (citation omitted); 18 U.S.C. § 3156(a)(4).  Furthermore, Lin committed the instant offenses while serving a term of supervised release.  These facts demonstrate that Lin is an unrepentant and ostentatious criminal capable of serious and violent crimes.  Furthermore, the evidence of Lin's guilt is strong.  The government will prove the charged crimes through, among other evidence, eye-witness testimony, victim testimony, cell site records, 911 calls, medical records, and photographic evidence.

Significantly, Lin has a substantial criminal history involving five felony convictions in federal court in 2010: racketeering, racketeering conspiracy, assault in aid of racketeering, illegal gambling and Hobbs Act Extortion.   In connection with these prior convictions, the defendant distributed ketamine at clubs in Queens, directed an assault in aid of racketeering in which a stabbing occurred, extorted a bus company, and destroyed a rival illegal gambling parlor.

Given Lin's past behavior, if released, there is a strong probability that he will continue to commit crimes and he should be detained.  See United States v. Milan, 4 F.3d 1038, 1047 (2d Cir. 1993) ("the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.") (citation omitted); United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) ("[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." (citation omitted).

The defendant also constitutes a substantial flight risk because (1) he faces a maximum term of 40 years' imprisonment and an estimated guidelines range of 97 – 121 months' imprisonment; (2) he has a history of disregarding the directives of courts and (3) is a Chinese citizen with a final order of removal from his prior convictions.

The likelihood of such a lengthy sentence provides a strong motive for the defendant to flee, especially in light of the strength of the evidence in this case.  See Bruno, 89 F. Supp. 3d at 43 ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long . . . a defendant has stronger motives to flee." (citation omitted)); Dodge, 846 F. Supp. at 184-85) (finding the possibility of a "severe sentence"

heightens the risk of flight).

Furthermore, since the defendant's release from prison in 2012 he was instructed by the court to, among other things, not associate with known felons and not commit additional crimes.  Notwithstanding these directives, the defendant committed a violent extortion and consorted with known felons.  On March 3, 2015, the defendant attended the wedding of Jin Long Lin, also known as "Gong Gong.'"  Long Lin, one of the defendant's previous codefendants, was convicted of racketeering conspiracy and illegal gambling in 2010.  Other felons were in attendance at this wedding, including Shun Qing Chen, also known as "Cousin," who was previously convicted of extortion.  Photographs of the defendant with Long Lin and of Chen at the same event are attached as Exhibit C.[5]

Lastly, the defendant, a citizen of China, has no legal status in this country and a final order of removal has been issued for him.  As he is subject to deportation, he has every incentive to flee.

C.      Guifu Gao, also known as "Chicken Feather"

Gao is a danger to the community.  First, "the nature and circumstances of the offense[s] charged" are extremely serious.  The defendant's charges are based on his participation in an assault conspiracy as part of his membership in a violent street gang.  Recorded conversations provide a definitive account of Gao's desire to inflict extreme injuries on John Doe 4.  In one recorded conversation, Gao instructed CW1 to "beat [John Doe 4] until he is half dead, fuck him."  Gao was unsatisfied with the results of the first "beating" of John Doe 4 and then escalated his instructions to CW1 – telling him to "stab his legs twice for me" and "break both

---

[5]   The man standing in the first photograph is Long Lin and the man sitting is Lin.  The man in the second picture wearing a pinkish polo shirt is Chen.

his legs in half for me."  Second, "the weight of the evidence against the [defendant]" is strong.

The charges will be proven by consensually recorded conversations – including recordings of the

defendant soliciting the assault in chilling detail – as well as the testimony of CW1, eyewitness

testimony and text messages, in addition to other evidence.  Finally, "the nature and seriousness

of the danger to any person or the community that would be posed by the person's release"

strongly supports a finding of dangerousness.  The defendant solicited an assault that would have

resulted in extremely serious injuries, and when the victim did not appear to have been beaten

severely enough, Gao escalated his requests and demanded that CW1 "make him crippled, make

him handicapped."  The only reason that the assaults were not carried out and John Doe 4 can

still walk is because unbeknownst to Gao, his target was alerted to his plans and feigned injury.

Therefore, the seriousness of the danger posed by release – the risk that the intended victim or

others will be seriously injured – could not be higher.

Gao is also a flight risk.  He faces a maximum term of 16 years' imprisonment and

an estimated guidelines range of 63 – 78 months' imprisonment.  Gao is a Chinese citizen with a

Chinese passport and since 2012 he has traveled to Hong Kong or Beijing at least three times.

The defendant's close ties and frequent travel China further increase his risk of flight.  Routollo,

No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. July 8, 1988) (defendant's frequent travel

abroad increased risk of flight); Solano–Fell, No. 07–CR–6197, 2009 WL 66071, at *2

(W.D.N.Y. Jan. 8, 2009) (defendant's foreign citizenship, family ties to other countries, and visits

to those jurisdictions suggested "a significant risk of flight"); United States v. Choudhry, 941 F.

Supp. 2d 347, 356 (E.D.N.Y. 2013) (finding that defendant posed a risk of flight where he was a

Pakistani citizen, held a Pakistani passport, had visited Pakistan recently and had family living in

Pakistan); United States v. Mercedes, 254 F.3d 433, 438 (2d Cir. 2001) (finding that defendant

was a flight risk where defendant was unemployed and not a U.S. citizen).

D.     Kai Huan Huang, also known as "Shen Shen"

Huang is a danger to the community.  First, "the nature and circumstances of the offense[s] charged" are extremely serious.  The defendant's charges are based on his participation in a violent extortion and assault, all as part of his membership in a violent street gang.   Huang and his confederates beat John Doe 2 with their hands and with wooden chairs.  John Doe 2 sustained bruising, swelling and a broken bone.  See Exhibit B.  Second, "the weight of the evidence against the [defendant]" is strong.  The charges will be proven by eyewitness testimony, 911 calls, photographic evidence and cell-site evidence, in addition to other evidence.  Finally, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" strongly supports a finding of dangerousness.  The defendant beat and man so severely he suffered a broken bone.  Huang also has a pending assault case in state court.  The defendant was arrested in August 2015 after slapping a woman and kicking her in the stomach.  Therefore, the seriousness of the danger posed by release is very high.

Huang is also a flight risk.  He faces a maximum term of 40 years' imprisonment and an estimated guidelines range of 78 – 97 months' imprisonment.  Huang is also a Chinese citizen with a Chinese passport and he has traveled to Hong Kong at least twice in the past two years.   Routollo, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. July 8, 1988) (defendant's frequent travel abroad increased risk of flight); Solano–Fell, No. 07–CR–6197, 2009 WL 66071, at *2 (W.D.N.Y. Jan. 8, 2009) (defendant's foreign citizenship, family ties to other countries, and visits to those jurisdictions suggested "a significant risk of flight"); Choudhry, 941 F. Supp. 2d 347, 356 (E.D.N.Y. 2013) (finding that defendant posed a risk of flight where he was a Pakistani citizen, held a Pakistani passport, had visited Pakistan recently and had family living in

Pakistan); Mercedes, 254 F.3d 433, 438 (2d Cir. 2001) (finding that defendant was a flight risk where defendant was unemployed and not a U.S. citizen).

E.     Xue Jiang Gao, also known as "Xue Zhang"

Zhang is a danger to the community.  First, "the nature and circumstances of the offense[s] charged" are extremely serious.  As part of his membership in a violent street gang, the defendant is charged with a violent extortion and assault in which he beat John Doe 2 with their hands and with wooden chairs.  The victim sustained bruising, swelling and a broken bone.  See Exhibit B.  Second, "the weight of the evidence against the [defendant]" is strong.  The charges will be proven by eyewitness testimony, 911 calls, photographic evidence and cell-site evidence, in addition to other evidence.  Finally, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" strongly supports a finding of dangerousness.  The defendant beat and man so severely he suffered a broken bone.

Jiang Gao is also a flight risk because he faces a maximum term of 40 years' imprisonment and an estimated guidelines range of 78 – 97 months' imprisonment.

F.     BILLY CHEN, also known as "Lo Di"

Chen is a danger to the community.  First, "the nature and circumstances of the offense[s] charged" are extremely serious.  The defendant's charges are based on his participation in an extortion conspiracy.   Chen and Zheng discussed having John Doe 1 beaten so that he would pay his alleged debt.   Chen further suggested that they damage John Doe 1's car as a warning.  The charges will be proven by eyewitness testimony, 911 calls, surveillance footage, cell-site evidence, and consensual recordings in addition to other evidence.  Finally, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" strongly supports a finding of dangerousness.  The defendant agreed to have a

man beaten, shots fired into his store and his car damaged to force him to pay them money.

Chen is a flight risk because he faces a maximum term of 20 years' imprisonment and an estimated guidelines range of 70 – 87 months' imprisonment.  Chen has also traveled to China and Tawian at least six since 2013.  His extensive travel abroad increases his risk of flight. Routollo, No. 87 CR 813, 1988 WL 147354, at *3 (E.D.N.Y. July 8, 1988) (defendant's frequent travel abroad increased risk of flight).

V.      CONCLUSION

For the reasons set forth above, permanent orders of detention should be issued as to the defendants Qian Zheng, Guifu Gao, Xin Lin, Billy Chen, Kai Huan Huang and Xue Jiang Gao.


Respectfully submitted,

Robert L. Capers
United States Attorney
Eastern District of New York


By:     /s/_____
        Nadia E. Moore
        Assistant U.S. Attorney
        (718) 254-6362

# EXHIBIT A





# EXHIBIT B



# EXHIBIT C















