

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MKM:NEM/MCM
F. #2015R00888

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 22, 2017

**REDACTED**

By Hand Delivery and ECF

The Honorable Carol Bagley Amon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Qian Zheng
>        Criminal Docket No. 15-628 (S-2) (CBA)

Dear Judge Amon:

The government respectfully submits this letter in advance of sentencing in the above-referenced case, which is scheduled for September 25, 2017.  For the reasons discussed below, the government respectfully requests that the Court impose a sentence at top end of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").

I.        Background

On January 31, 2017, the defendant, Qian Zheng, also known as "Cash" ("Zheng" or the "defendant"), pled guilty to Count One of the Second Superseding Indictment (the "Indictment").  Count One of the Indictment charged that between January 2007 and September 2015, the defendant, together with others, conducted and participated in the affairs of the Zheng Organization through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(c).  The charge against the defendant arose from his years-long control of the Zheng Organization, a violent street gang that operated in Flushing, Queens and Sunset Park, Brooklyn.

II.     Charged Offenses

    A.  2013 Solicitation of Assault of John Doe 3 and Jane Doe 1

          In or about August 2013 Zheng told two cooperating witnesses ("CW1" and "CW2," respectively) to do a "job" for him.  Specifically, Zheng explained to CW1 and CW2 that he had been hired to assault two individuals, referred to in the Indictment as John Doe 3 and Jane Doe 1, respectively, because of a dispute between John Doe 3 and his ex-girlfriend, a woman known as Lao Mei.  After their relationship ended, Lao Mei accosted John Doe 3 on a number of occasions.  Lao Mei subsequently hired the defendant to assault John Doe 3 and his wife, Jane Doe 1.  Ultimately, the plan to assault John Doe 3 and Jane Doe 1 was not carried out because they were advised of the defendant's plan to have them assaulted.  In an attempt to avoid being assaulted at the direction of the defendant, John Doe 3 and Jane Doe 1 pretended that they had, in fact, been assaulted and feigned injury.

    B.  Narcotics Distribution and Conspiracy to Distribute Narcotics

          Zheng participated in the distribution of ketamine and MDMA.  For years, Zheng regularly distributed ketamine to his underlings at nightclubs.  During this period, Zheng distributed ketamine to approximately twenty people at a time.  Zheng also conspired with others to distribute MDMA in 2015.  In recorded conversations, Zheng approached CW2 and asked CW2 if he could sell drugs for him.  CW2 agreed and Zheng explained that the drug was ecstasy.  Zheng then accepted $1,000 from CW2 that CW2 represented was the proceeds of the drug sales.

    C.  2013 Extortionate Collection of Credit from John Doe 1 Conspiracy

          In December 2013, Zheng approached CW1 and CW2 about another "job." Zheng told them that a restaurant owner in upstate New York owed "money club"[1] money to a friend.  A few days later, Zheng took CW1, CW2 and Billy Chen, also known as "Lo Di," upstate to identify the target, the individual identified as John Doe 1 in the Indictment.  The defendant explained that he wanted them to hire a few "black guys" to fire gunshots into the restaurant.  They went to the restaurant and ate while waiting for John Doe 1.  After they determined that John Doe 1 was not there, they went to his house.  Shortly after arriving at his house, John Doe 1, fearful of what might occur, exited his house, got into his car and blocked Zheng's SUV from moving while he called the police.  When the police arrived, they

---

       [1]      A money club consists of a group of people, who at regularly scheduled intervals, are expected to contribute a set amount of money to the club.  These contributions provide the capital that the money club uses to make loans to its members.  Each period, a member can bid if they wish to take a loan from the money club.  The winner will receive the "pot."  During the next interval, each member again contributes to the money club to refresh the "pot."  The individual who won the previous "pot" will pay his regular contribution as well as a percentage of the loan that he previously received.

spoke with Zheng, but ultimately let him leave.  Zheng then explained to his co-conspirators that it would be best to hold off on the job because the police had obtained Zheng's personal identifying information.

### D.  Operation of an Illegal Gambling Business

Zheng ran a high stakes gambling game in early 2014, which took place in a building located at 5917 7th Avenue in Brooklyn.  The high stakes game lasted approximately 36 hours.  Zheng hired CW2 to serve as a dealer for the game.  In addition to CW2, there were a number of other dealers present at the game, including Kai Huan Huang, a member of the Zheng Organization.  Zheng also hired security guards and accountants for the game.  Zheng later paid CW2 $1,000 for his work as a dealer.  Zheng also told CW2 that Zheng had grossed over $70,000 from the high stakes game, and that, after expenses, he had made approximately $60,000.

### E.  2014-2015 Solicitation of Assault of John Doe 4

In approximately August 2014, the defendant's co-defendant Guifu Gao, also known as "Chicken Feather," gave the individual identified in the Indictment as John Doe 4 approximately $30,000 to transfer by wire to China.  John Doe 4 was aware that Gao owed another individual $15,000.  Instead of wiring the $30,000, John Doe 4 provided $15,000 to the individual to whom Gao owed money and returned the remaining $15,000 to Gao.  Incensed that John Doe 4 had used his money to repay one of Gao's debts without his authorization, Gao approached the defendant, seeking to hire one of Zheng's criminal associates to assault John Doe 4.  The defendant introduced Gao to CW1 so that CW1 could carry out the assault.  CW1 stated that he would get the "job" done by hiring a few "black guys" to carry out the beating.  Ultimately, the plan to assault John Doe 4 was not carried out and John Doe 4 was informed of Gao's intentions.  John Doe 4 feigned injury in an attempt to avoid further retaliation from Gao.

### F.  2015 Extortion and Assault of John Doe 2

In May 2015, the defendant, and a number of  his co-defendant underlings, including Xin Lin, also known as "Blackie," Kai Huan Huang, also known as "Shen Shen," and Xue Jiang Gao, also known as "Xue Zhang," extorted the individual identified in the Indictment as John Doe 2 because they believed that John Doe 2 owed money to a woman known as "Hong."  A group of approximately seven of Zheng's underlings went to John Doe 2's gambling parlor in Brooklyn at Zheng's behest.  The men demanded money from John Doe 2, and when he claimed that he did not owe any money, the men beat him with their fists and with wooden stools, and destroyed his parlor causing thousands of dollars of damage.

### G.  Naturalization Fraud

The defendant became a United States citizen on September 27, 2011.  During the naturalization process he falsely claimed, among other things, that (1) he had never

committed a crime or offense for which he was not arrested, (2) had never sold or smuggled controlled substances, illegal drugs or narcotics, (3) had never gambled illegal or received income from illegal gambling and (4) had never helped anyone enter or try to enter the United States illegally.

III.   Guidelines Calculation

The defendant's Guidelines calculation is as follows:

Count One (Racketeering)

| | |
|---|---|
| Base Offense Level (§§ 2E1.1(a)(2), 3D1.4) | 30 |

MDMA Distribution Conspiracy

| | |
|---|---|
| Base Offense Level (§ 2D1.1(c)(11)) | <u>18</u> |

2013 Extortionate Collection of Credit from John Doe 1 Conspiracy

| | |
|---|---|
| Base Offense Level (§ 2E2.1(a)) | 20 |
| Plus:   Firearm Discharged (§§ 2E2.1(b)(1)(A), 2X1.1(a)) | +5 |
| Plus:   Bodily Injury (§§ 2E2.1(b)(2)(A), 2X1.1(a)) | +2 |
| Total: | <u>27</u> |

Illegal Gambling Business

| | |
|---|---|
| Base Offense Level (§ 2E3.1(a)) | <u>12</u> |

2015 Extortion of John Doe 2 Conspiracy

| | |
|---|---|
| Base Offense Level (§ 2B3.2(a)) | 18 |
| Plus:   Threat of Bodily Injury (§§ 2B3.2(b)(1), 2X1.1(a)) | +2 |
| Plus:   Dangerous Weapon (§§ 2B3.2(b)(3)(iv), 2X1.1(a)) | +4 |
| Plus:   Serious Bodily Injury (§ 2B3.2(b)(4)(B), 2X1.1(a)) | +4 |
| Total: | <u>28</u> |

Multiple Racketeering Acts Analysis (§ 3D1.4)

| | |
|---|---|
| Highest Adjusted Offense Level | 28 |
| Units: | |
| Extortionate Collection of Credit Conspiracy (§ 3D1.4(a)) | +1 unit |

| | |
|---|---|
| Extortion Conspiracy (§ 3D1.4(a)) | +1 unit |
| Total Units: | 2 units |
| Levels Added (§ 3D1.4) | +2 |
| Total | 30 |
| Less:   Global Disposition | -1 |
| Plus:   Aggravating Role (§ 3B1.1(a)) | +4 |
| Total | 33 |

Because the defendant timely accepted responsibility, his offense level is reduced by three levels, resulting in a total offense level of 30. The Probation Department has correctly determined that the defendant has no criminal history, and thus falls into Criminal History Category I. Accordingly, the defendant's Guidelines range of imprisonment is 97 to 121 months.

IV.   Sentencing Factors

Title 18, United States Code, Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation (§ 3553(a)(2)(A)), as well as the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes or violations of the defendant (§ 3553(a)(2)(C)). All of these factors require a sentence at the top of the Guidelines range.

A.   Seriousness of Offense

The seriousness of the defendant's crimes cannot be understated. The defendant ran a violent criminal organization that operated across two boroughs for several years, tasking his underlings with, among other things, carrying out violent extortions and assaults. In addition, he distributed ketamine and MDMA. Zheng also operated an illegal gambling business.

As a result of Zheng's conduct, he developed a reputation for violence in the community. For example, in October 2013, Jiyao Jiang, Billy Chen and a man known as Tai Bo attempted to collect an alleged debt from John Doe 1. After they were unsuccessful in their attempts, the defendant became involved. Chen, knowing the defendant's reputation for violence, sought Zheng's assistance in collecting the debt.

Zheng agreed to force John Doe 1 to pay the debt and hired CW1 and CW2 for the job. Billy Chen, Zheng, CW1 and CW2 went to John Doe 1's restaurant and house to

5

look for him on December 12, 2013.  (Exhibit A[2] at 519 – 552; Jiyao Jiang Trial Tr. at 254-58.)  When he provided CW1 with details about the "job," the defendant explained that "that person owes so much money, he deserves it."  The defendant also instructed CW1 to ask "him to pay back . . . if not, just beat him up." (Ex. A at 501)

On their way to look for John Doe 1, the men discussed destroying John Doe 1's car and the defendant suggested that a gun be fired into his restaurant to ensure his repayment of the debt:

ZHENG:      Next time, these kids will go there by themselves.  They will bring the guns, fire two gunshots and leave.  We go back to talk to him again.  "Do you want to settle it?  If you don't, we will come back here every day.  The next time, it will not be like this."  Can't help it.  Without this kind of ability, it's so hard to make money.  Especially for those who try to collect the money, they deserve a lot of sympathy, you know?

. . .

ZHENG:      When you are free and have nothing to do at night, just drive two guys here. Fire two gunshots and leave.

. . .

ZHENG:      Tell the black guys to go there and punch him first, you know?

CW1:        Oh.

ZHENG:      Punch him first.  It's okay to punch him.  He owes money.  Let him call the police.  Probably he needs to be punched first, he probably needs to be punched first.  Otherwise, he won't pay any money.

(Ex. A at 531 – 538.)

The defendant also explained that Chen should "get [John Doe 1] beaten to calm [his] anger first.  Get him first."  (Ex. A at 531).  The defendant then reminisced about the old days when he could use more extreme force to solve disputes:

ZHENG:      Motherfucker, it's not like before . . . not like before . . . .

LEE:        Like to kidnap him, right?

ZHENG:      Nowadays, don't kidnap him, nowadays, just beat him.

_____

    [2]     Transcripts of consensually recorded conversations related to the defendant's criminal conduct are attached as Exhibit A.

6

(Ex. A at 543.)

When they arrived at John Doe 1's home, John Doe 1 saw the defendant and the other men and used his vehicle to block them in to the dead-end street. John Doe 1 then called the police, who recorded the defendant's information. (PSR ¶ 24; Trial Tr. at 258-59.) After this incident with the police, the defendant and his co-conspirators ceased efforts to collect money from John Doe 1. (Trial Tr. at 259.) John Doe 1 testified before Your Honor in November 2016 and explained how terrifying the extortion was. He was so fearful, that the 911 dispatcher believed that he was a woman because his voice was so high pitched with fear. As he explains in his letter he is still scared of retaliation, and has moved to another state in order to ensure his safety. (PSR ¶ 57).

In May 2015, the defendant conspired with other Zheng Organization members, including Xin Lin, also known as "Blackie," Kai Huan Huang, also known as "Shen Shen," and Xue Jiang Gao, also known as "Xue Zhang," to extort John Doe 2 because they believed that he owed money to a woman known as "Hong." More specifically, on May 28, 2015, the defendant sent a group of approximately seven of his underlings, including Xin, Gao and Huang to John Doe 2's gambling parlor in Brooklyn. (PSR ¶ 28.)

When the men entered John Doe 2's parlor, Lin asked for John Doe 2, and when John Doe 2 identified himself, Lin, Gao and Huang surrounded him. Lin then stated that John Doe 2 owed money and demanded that he pay it back. (Id. at 30.) When John Doe 2 explained that he did not owe any money, Lin, Gao, and Huang began to beat him with their fists and with wooden stools. (Id. at 31) They beat him on his head and his hands, and on his body, knocking him down. The defendant's underlings also damaged John Doe 2's gambling parlor. They smashed his television, chairs and tables, causing thousands of dollars of damage. (Id.) Pictures of John Doe 2's parlor after the assault are attached hereto as Exhibit B. Before leaving, Lin told John Doe 2 that if he did not repay the money they would return. John Doe 2 was left battered, bruised and with a fractured finger as a result of the beating. A picture of his bruised and swollen hand as it appeared after the assault is attached hereto as Exhibit C. A witness to the assault described it as "horrific." Later that evening, two more of the defendant's underlings went to John Doe 2's gambling parlor and told him that they had been sent by Cash – their "Dai Lo."[3] The men told John Doe 2 that if he did not report the incident to the police, Cash would reimburse him for his hospital costs and damaged parlor. (Id. at 33) John Doe 2 refused and informed law enforcement of the assault.

Approximately one month later, John Doe 2 was examined by a doctor. The doctor determined that John Doe 2 still suffered tenderness to his chest, back, wrist and pinkie finger. The doctor also determined that John Doe 2 had a fractured pinkie and a deformity to the finger. To this day, John Doe 2's finger remains deformed. (Id. at 34)

---

[3]     Dai Lo is a Chinese term used to refer to a gang boss.

The defendant ordered numerous acts of violence that were carried out, or planned to be carried out by his gang.  The two extortions that served as racketeering predicates, plainly demonstrate the grave danger to the community created by the defendant and the Zheng Organization.  The nature and circumstances of the crime warrant a significant sentence – a sentence at the top of the Guidelines range.  See 18 U.S.C. § 3553(a)(1)-(2).

B.  Defendant's Additional Criminal Activity

In considering the "history and characteristics of the defendant," see 18 U.S.C. § 3553(a)(1), the Court should consider the defendant's additional unlawful conduct.  In addition to the four racketeering predicates, the defendant committed numerous crimes over a number of years.

1.  Bus Passenger Assault

On May 7, 2013, Zheng directed CW2 to assault a bus passenger, which CW2 did at Zheng's behest.  The police received a 911 call reporting that Chinese males were arguing with a black male.  New York City Police Department ("NYPD") officers responded to the call.

2.  2013 Solicitation of Assault of John Doe 3 and Jane Doe 1

As discussed above, in August 2013, the defendant was hired to carry out a spurned lover's revenge.[4]  Zheng hired CW1 and CW2 to carry out the assault.  The defendant provided them with John Doe 3's and Jane Doe 1's home and work addresses.  He also provided them with John Doe 3's and Jane Doe 1's daily schedule, a photograph of John Doe 3, and took them to the victims' home and pointed out their car.   The defendant also provided them with explicit instructions on the injuries he wanted inflicted:

CW2:        Both the man and the woman need to be beaten up?

ZHENG:     Just beat both of them.

_____

[4]        The defendant attempts to minimize his culpability for a number of offenses where he was hired to carry out acts of violence by claiming that because he was not the "holder of a proprietary interest in the offense conduct" (Def. Ltr. at 5), he is somehow less culpable.  This is nonsensical, especially in light of the fact that the defendant was the leader of a violent gang, and those who were aware of his reputation for violence knew that he could be counted on to respond violently to perceived slights.  That the defendant was hired by others to commit acts of violence does not mitigate his responsibility.  He was a willing participant, and as the recorded conversations make clear, the defendant was paid for his involvement in these schemes.  (See, e.g., Ex. A at 59 (Zheng: "How much is the other side going to pay [us]?  How much do you guys want to be paid?  I will go to talk to them about how much to pay.").)

8

. . .

| | |
|---|---|
| CW2: | You have to make it clear.  Call that person, if the black guys go there, things will get out of control, they will kill him, it will be problematic. |
| ZHENG: | No.  No need. |
| CW2: | Huh?  No need? |
| ZHENG: | Yeah. |
| CW2: | So just beat him up randomly or what? |
| ZHENG: | Just beat him up.  Beat up his leg. |
| CW2: | Break his leg? |
| ZHENG: | Yeah. |
| CW2: | So we need to tell them to bring the baseball bat to beat him. |

. . .

| | |
|---|---|
| CW1: | She said to break the leg, right? |
| CW2: | Break his leg. Okay. |
| ZHENG: | Yeah.  Break his leg.  Scar the woman's face. |

(Ex. A at 53, 60 – 61, 68.)

The consensual recordings discussing this assault also captured the defendant's callousness. At one point, he explained that CW1 and CW2 should "just beat him every time he is seen. Don't need to care about him.  Just play with him."  (Ex. A at 111.)  The defendant also agreed with CW1 and CW2 that the beating should take place in Brooklyn so as to avoid detection by the police and approved of the use of Bloods gang members to carry out the attack.  (Ex. A at 54, 58.)  The defendant noted in a recorded conversation that Lao Mei paid him $6,000, but explained that he would ask her for an additional $2,000 or $3,000.  The defendant also provided $2,000 to pay the "black guys."  (Ex. A at 96, 102 – 103.)

CW1 and CW2 did not break John Doe 3's leg or slash Jane Doe 1's face as requested by the defendant.  Instead, John Doe 3 and Jane Doe 1 were alerted to the defendant's plan and feigned injury.  In fear for his life, John Doe 3 pretended that he had been beaten so severely that he had been hospitalized.  In order to carry out this ruse, he went

9

into hiding for a few months.  Jane Doe 1 wore bandages on her body to feign injury.  John Doe 3 explained that during this time, he and Jane Doe 1 lived in a constant state of fear and that they "were hiding in various locations in attempts to avoid criminals who were after us.  Our bodies, minds and spirits were on the verge of collapsing."  To this day, they "still live in terror" as a result of what he calls this "vicious murder-for-hire tragedy."  (PSR ¶ 59.)

### 3.      Additional Narcotics Distribution

In August 2013, in a recorded conversation, the defendant suggested that the "black guys" that he believed had been hired to carry out the August 2013 assault of John Doe 3 and Jane Doe 1 be used to distribute marijuana for him.  (See Ex. A at 69 (Zheng: "After that is done, we can give them some marijuana to sell, is that alright?").)  On another occasion in April 2015, Zheng discussed obtaining marijuana in California for distribution with CW1.  (See Ex. A at 300 ("Other people give us the marijuana, can we sell it?   . . . . What about this group of black guys?  Can they sell it?").)  The defendant also discussed how long it would take to drive the marijuana from California and whether there would be check points along the way.  In this same conversation, the defendant explained that he had a lot of ketamine, but that he did not want to use CW2 to distribute it because CW2 owed him money.  (See Ex. A at 303 – 304, 306.)  On May 19, 2015, the defendant sought to finalize his marijuana distribution plan with CW1:

CW1:          The black guys . . . uh . . . they saw this . . . they wanted to ask you what your price is for them down the road.

                                          . . .

ZHENG:       The number in the back is the price, right?

CW1:          Yeah.

ZHENG:       How much can they sell?

CW1:          Depends on how much you provide to them.  For them . . . they can sell over ten pounds each week.

ZHENG:       Oh.

CW1:          Pretty fast.

ZHENG:       Pretty fast?  I haven't talked it out yet.  Once I talk it out, I . . . I will . . . I used this one myself.  It's good.  I went there to use it myself.

CW1:          You used it yourself?

ZHENG:       It is homegrown.

10

CW1:        What kind . . . what is it called?

ZHENG:      I don't remember what the name is.  It is homegrown.  No chemical was used.

CW1:        No chemical was used?

ZHENG:      Yeah.  The other ones had chemicals applied.

CW1:        Is it home grown in California?

ZHENG:      Yeah.

CW1:        What is the price range?

ZHENG:      I don't know.  The price hasn't been set yet.  I have to find time to go over there to talk it out.  If you take it in, can they sell all of it?  The money . . . what's the situation with the money?

CW1:        Money?

ZHENG:      Yeah.

CW1:        I will talk to them about the money situation.

ZHENG:      Let me tell you about the money situation.  I don't know them.

CW1:        Oh.

ZHENG:      If they are reliable, we can give them the stuff to sell.  We can get the money from them after they sell it.  That's fine.

CW1:        Alright.

ZHENG:      They will continue to do the work for us.

CW1:        Sure.

                                    . . .

ZHENG:      So I need to connect the routes.  After the routes are done, I used to have some black guys myself.  But I have not been in touch with them for a long time.  They are in East New York.  I didn't go there to get it.

CW1:        East New York?

ZHENG:      Hmm.  If you have it and it's alright, then ask them to sell for us.

CW1:        Sure.  They are in Bronx.  They have a lot of customers.

ZHENG:      Just tell them to sell . . . .

(See Ex. A at 372 – 374, 377 – 378.)

On May 20, 2015, the defendant discussed this plan to distribute marijuana with CW2 telling him that "when the marijuana gets here, I will let you know.  I told the other guy the other day."  (Ex. A at 439.)

### 4.      The Philadelphia Bus Assault/Extortion

In addition to the 2013 extortionate collection of credit from John Doe 1 conspiracy and the 2015 extortion of John Doe 2, the defendant committed or solicited numerous crimes of violence.  For instance, in the summer of 2013, the defendant directed CW1 to hire "some black guys" to assault an employee of a Philadelphia-based bus company.

ZHENG:      You have black guys.  Get them to come to Chinatown one day.  There is a company here.  I don't remember where their company is in Philadelphia.  Go and beat them up.

CW1:        For what?

ZHENG:      It's no problem for the fight.  Fist fights are no problem.

CW1:        For what?

ZHENG:      When the vehicle gets off here, I will point out the vehicle to you.  Get the guys to go over there to the vehicle.

                                    . . .

ZHENG:      Make the arrangement to go to the company in Philadelphia.

CW1:        Is it convenient to do the beating in New York?

ZHENG:      It is better to beat in New York.

CW1:        In Philly, if there is something . . .

ZHENG:      In New York, it will be no problem for the black guys.  It's just fights for them.  Pick a day . . . get the black guys . . . if they are arrested, it will have nothing

to do with us.

. . .

ZHENG:          Pay a thousand or two to the black guys.  Get the black guys to do it.  That's it.

(Ex. A at 40 – 41, 43 – 44.)

       In another recorded conversation, the defendant again explained that he wanted CW1 and CW2 to use "black guys" to carry out the assault of the Philadelphia bus operator:

CW1:            The black guys are really ballsy, you know?

ZHENG:          Ballsy?  Let me tell you.

CW1:            Yeah.

ZHENG:          Very ballsy, let's give them a big deal to do.  Tell them to go to Philadelphia and that one . . . drive to Philadelphia, to the bus station early in the morning, pick a time, do that deal after this one is done.

(Ex. A at 69.)

       In December 2013, the defendant continued to discuss having the "black guys" from prior assaults carry out the beating of a bus operator, now wanting to have the attack carried out in Philadelphia:

ZHENG:          Also, after this, take them to Philadelphia to beat someone for me.

CW1:            Philadelphia?

ZHENG:          Yeah.  Don't go to . . . the person is in Chinatown . . . I don't want to have the beating done in Chinatown.

CW1:            Hmm.

ZHENG:          You understand?

CW1:            Okay.

ZHENG:          It's a van.  Just pretend . . . pretend to be a customer and argue. . .

CW1:            A van route?

ZHENG:          Yeah.

CW1:            Okay.

ZHENG:          Just pretend to be a customer.  Argue with him and beat him.  Beat him up and
                then call the police.

(Ex. A at 497– 498.)

>                5.          The Ah Tong Extortion

In approximately August 2013, CW2 told Zheng that he had gotten into an
argument with "Ah Tong."   Zheng explained that "you should get this guy beaten!" The
defendant also advised that if "Ah Tong" had money, they should extort him.  (See Ex. A at
126 – 128.)

>                6.          The 2013 Kidnapping Plan

In approximately August 2013, the defendant informed CW1 and CW2 that a
person in Canada owed millions of dollars to a Wenzhounese person.  The defendant and his
wife, Yi Dong Chen, further explained that the Wenzhounese person would pay Zheng if he
could help recover the money.  The defendant explained that if the debtor did not pay the
money, they would kidnap him:

ZHENG:          [U/I] go to Canada.

CW2:            Canada?

ZHENG:          Do you want to go?

CW2:            Doing what?

ZHENG:          You are a citizen, you can go whenever.

CW2:            Right.

ZHENG:          That son of a bitch owes over $40,000,000.

CW2:            How much?

CW1:            Over $40,000,000?

CW2:            Over $40,000,000?

ZHENG:          Yes.

CW2:        Who?

ZHENG:      Wenzhou guy owes . . . owes . . . oh . . . owes Wenzhou guy the money.

CW2:        One Wenzhou guy owes the other Wenzhou guy over $40,000,000?

CW1:        Over $40,000,000?

CW2:        We go there to collect the money back, how much are we going to get?

ZHENG:      At least . . . as much as possible.

CW2:        Oh, when can we get it?

CHEN:       We can get about 20% . . . about 20%.

CW2:        20%?  How much is that?  A couple of million dollars?

CHEN:       He said . . . nah . . . he said if collecting $10,000,000. . .

ZHENG:      Collecting $10,000,000.

                                        . . .

ZHENG:      We go over there.  Do you understand what I am saying?

CW1:        Ah.

ZHENG:      We . . . after we find things out clearly, we tell him to . . . the stuff . . . um . . .
            well . . . find out about his house, we just need to press him down and then
            throw him into the car.

CW1:        Kidnap him?

ZHENG:      Not to say it.

CW2:        Oh . . . .

ZHENG:      Throwing him in the car.

CHEN:       Kidnap?  What if the police are called?  What if the police are called when
            giving the money?

CW1:        Is it going to be a problem?

15

CHEN:          It is shown on TV.  Nowadays, the TV is for a show and the reality is like that.
               Do you understand?

ZHENG:         We go there from U.S.A., after the deal is done, just come back.

                                          . . .

ZHENG:         We might have to take him, without taking him, this might not be resolved.

(Ex. A at 120 – 121, 122 – 123.)

> 7.      The 2014 Bus Extortion

On July 22, 2014, CW1 approached Zheng to find out who was competing with
a certain bus company.  Zheng confirmed that he operated the competing bus line, but that if
he was paid off, he would stop competing with the other bus company.  (See Ex. A at 23 –
25.)

> 8.      The 2014 Extortion of Brothel Owner

In August 2014, the defendant instructed CW1 and CW2 to extort a brothel
owner:

ZHENG:         I will send an address to two of you soon.  You . . . you guys go to Brooklyn.
               There is a brothel.

CW2:           What?  A brothel?

CW1:           A brothel.

ZHENG:         A brothel.  You just go in there, go in and destroy everything inside.  You . . .
               you take charge of. . . you take charge of . . . I will give you the address.  You
               go in there.  Bring some people and go in there.  Go in there and smash it up.
               Go in there and smash it up.  No need to say anything.

CW2:           Go in there and smash it up?  You mean to smash every single one of them?

ZHENG:         Her . . . her brothels, we will smash all of them up.

CW1:           She has many brothels, right?

ZHENG:         She has many brothels.  After the smashing, you don't. . . you don't need to say
               anything.  After the smashing, she will send people to come and talk.  After
               talking . . .

CW2:      So we don't go in to do the smashing ourselves.  We send somebody else to go.

ZHENG:     Yeah.  Send somebody else to do the smashing.  Fine.

. . .

ZHENG:     Bottom line is I want . . . I want her to come to talk to us on her own.  You understand?  Come to . . . this, this person has money.

. . .

ZHENG:     A lot of money.  We . . . her brothels have great businesses.  We want to make . . . we want to make her reach out to us, offering whatever the amount of money as a settlement.  You know?

CW2:      Oh.

ZHENG:     Anyway, you don't need to be bothered with anything else.  You go in there . . . anyway, as long as you can enter, destroy and smash everything inside.  Tell them not to open up the next day.

. . .

ZHENG:     Brothels are the best.  No problem for anyone to go inside.  Get an opportunity to go in there, destroy important things inside, and make sure they can't open for business.

CW2:      Huh?

ZHENG:     You can smash it up.  Don't let her do business, you know?

. . .

ZHENG:     We get this done.  At the minimum . . . you understand?  At the minimum, we will get $15,000.

(Ex. A at 3 – 7, 10.)

      9.      2014 Assaults

In August 2014, the defendant discussed accosting a man who he believed owed him money:

ZHENG:     Ah Miao ran back to China.  That fucking guy still owes me $20,000 or $30,000.

17

|  | I need to charge into his home.  This motherfucker!  Other people said he has money.  He said he doesn't have money. |
|---|---|
| CW1: | Is that so?  He has money? |
| ZHENG: | Yeah. |
| CW1: | He should have money.  I saw him gambling every so often. |
| ZHENG: | Yeah.  I saw him gambling all the time.  This motherfucker!  Son of a bitch!  I need to charge into his house, too.  This motherfucker!  Such good friends can't be . . . he owes me the money for several months already, you know?  Since December. |

(Ex. A at 12.)

This conversation makes clear that the defendant did not hesitate to resolve perceived slights with violence, and considered extortion unexceptional.

Later in this same conversation, the defendant explained that he would threaten another individual who he believed owed him money with deportation if he was not repaid.

| ZHENG: | YY is coming back next month, right? |
|---|---|
| CW2: | He went back last month. |
| ZHENG: | Yeah.  He went back . . . went . . . to get money . . . |
| CW2: | He has . . . he . . . fuck . . . fuck . . . he has money.  He is purposely acting like this, you know? |
| ZHENG: | I was about to barge into his house, you know?  He said he paid you already. |
| CW2: | He asked me to take care of it.  I said okay.  That's okay. |
| ZHENG: | So did you lose the money or did he lose the money? |
| CW2: | He lost the money.  Would I be such a high roller? |
| ZHENG: | Fuck! |

| CW2: | It's okay.  He said he has it.  Next month he will come back.  He has the money. |
| ZHENG: | What kind of official is his father in Beijing? |
| CW2: | Not an official.  A business owner. |
| ZHENG: | Huh? |
| CW1: | A business owner? |
| CW2: | Yeah.  Big corporation. |
| ZHENG: | A business owner.  Tell him, fucking business owner, he would be deported back to work as a business owner.  For him to have enough balls to cheat money from me![5] |

(Ex. A at 14 – 15.)

### 10.     2014-2015 Solicitation of Assault of John Doe 4

In the fall of 2014, the defendant tasked CW1 with carrying out an assault on behalf of his co-defendant underling Guifu Gao that would have resulted in extremely serious injuries to John Doe 4.  When John Doe 4 did not appear to have been beaten severely enough, Gao escalated his requests and demanded that CW1 make John Doe 4 "crippled" and "handicapped."  Gao directed CW1 to use whatever violent means necessary to achieve his demands, including stabbing John Doe 4 in his legs, breaking John Doe 4's legs "in half," and beating him "until he is half dead."  Recorded conversations made by CW1 capture the truly violent nature the plan, recording Gao soliciting the assault, explaining in detail how he wanted the assault carried out, and arranging payment for the assault.  In one such recording from October 30, 2014, Gao and CW1 first discussed that the "boss" (referring to the defendant) had put them in contact and that Gao wanted John Doe 4—whom Gao described as "a fucking kid" and "[a] nobody"—to be "beat up."  (PSR ¶ 43.)  When CW1 asked how John Doe 4 should be beaten, Gao responded, "beat him . . . beat him . . . beat him until he is half dead. Fuck him."  (Id.)

CW1 did not have John Doe 4 beaten and instead John Doe 4 was alerted to Gao and Zheng's plan and feigned injury for his own safety.  CW1 also falsely told Gao and the defendant that John Doe 4 had been beaten.  However, when Gao saw that John Doe 4 had

returned to work, he was unsatisfied with the result of the supposed beating.

In a recording made by CW1 on December 25, 2014, Gao complained to CW1 that John Doe 4 had not been satisfactorily beaten and was able to go back to work because he was uninjured. (Ex. A at 186 ("We fucking said that we wanted it done severely. The black guys probably only fucking waved around [the bats] sloppily. It hasn't even been a few fucking days. He went back to the store already. Like nothing ever happened.").) In fact, unbeknownst to CW1, Gao was so unsatisfied that he and another individual accosted John Doe 4 themselves as he walked to his car with his girlfriend and her two small children, who witnessed the attack on John Doe 4. ("I even charged into his store to push him already, you know?"). Gao then instructed CW1 that he needed to "stab" John Doe 4's legs "twice" and "break his legs[.]" (Ex. A at 187 – 188.)

In a recorded conversation from January 1, 2015, Gao continued to express his dissatisfaction with the injuries that John Doe 4, who he referred to as a "son of a bitch," had sustained and complained that the "the beating is not severe enough. Maybe the beating gave him a scratch, or just flesh wounds, not serious." Gao told CW1 to "break his legs in half for me. . . . break both his legs in half for me." (Ex. A at 198 – 199, 202.)

On January 4, 2015, Gao again confirmed with CW1 that he wanted him to "break both of his legs." Later than night, when CW1 informed Gao that the "black guys" were at the store to assault John Doe 4, Gao explained that he now also wanted them to "break his right arm . . . in half as well." (Ex. A at 215, 222.) Gao also explained that they needed to beat him "not to injure him [but to] break it in half . . . . You need to break it in half. Of course break it in half . . . Break his arm and legs in half." (Ex. A at 222.) Later that night, in another recorded conversation, CW1 falsely told Gao that the "job [wa]s done." (Ex. A at 225.) At Gao's direction, CW1 also informed the defendant that John Doe 4 had been attacked and discussed payment. (Ex. A at 209 (CW1: "Chicken Feather Duster told me to call you just now. Motherfucker, last night the job was done. Now the black guys are waiting for their money. He was supposed to pay last night, but he told me to call you first.").) Thereafter, in a recorded conversation on January 6, 2015, Gao paid CW1 $5,000. (Ex. A at 244.) Gao explained that once he verified that the assault had taken place, he would pay CW1 the balance owed for the job. (Ex. A at 245.) Gao explained that the Victim "needs to be disabled . . . crippled, make him handicapped." (Ex. A at 248.)

While Gao primarily instructed CW1, the defendant remained involved throughout this chilling incident. In a recorded conversation, CW1 reported back to Zheng and explained that the job was done, but that Gao had not yet paid him. (Ex. A at 237.) The next day, Gao explained that he needed John Doe 4's legs broken as opposed to stabbed because "fuck, to stab him twice on his legs, fuck, he would recover from two stabbing wounds on his legs. They wouldn't be broken . . . . The wounds on the legs will recover . . . . If they are broken . . . he needs to be disabled . . . . Stab him twice, fuck, he would recover in a few days. He could walk again. We break them, okay?" (Ex. A at 248.)

In a recorded conversation from March 31, 2015, the defendant explained that

CW1 had not completed the job satisfactorily and that John Doe 4 had not been injured seriously enough: "the first beating was alright. The second time there wasn't any injury." (Ex. A at 269.) CW1 explained that Gao "told me to get the black guys to go there [to John Doe 4] and fire two shots[.]" (Ex. A at 269.) CW1 expressed concern to the defendant that Gao would not compensate him for the assault and CW1 reported that Gao had told him that money would not be a "problem" because Gao had "followed" Zheng for "over ten years[.]" (Ex. A at 271.) In response, the defendant assured CW1 that "[m]oney is not a problem. It was because he saw that you didn't take care of the matter well. He did tell me the other day. He told you to break a leg. The leg was not broken." (Ex. A at 271.)

Gao sought to have John Doe 4 beaten further after he was unsatisfied with his prior purported injuries. In an April 2015 recorded conversation, CW1 asked whether Gao had told the "boss" (the defendant) of Gao's continued desire to have John Doe 4 beaten. In response, Gao said that he told the boss and the "boss said okay. He wants you to go ahead." (Ex. A at 275.) Thereafter, in a recorded conversation from April 28, 2015, the defendant told CW1 "That motherfucker [John Doe 4] is not scared after getting beaten. Motherfucker, keep beating him . . . maybe he wasn't beaten seriously enough! . . . . follow him home and beat him in front of his house at night. Beat him hard." The defendant explained that "if [Gao] is not happy with that person, just beat him." (Ex. A at 310 – 311.) In another recorded conversation from May 19, 2015, the defendant instructed CW1 "[w]hatever [Gao] requests, you just get it done. You understand?" (Ex. A at 377.) These conversations not only demonstrate that Zheng was familiar with the details of Gao's plan to have John Doe 4 assaulted, but also shows that the Zheng facilitated and approved of the plan and oversaw Gao, who had followed the defendant for a decade.

In another recorded conversation from July 27, 2015, Gao told CW1 that "I cannot let a son-of-a-bitch like this [John Doe 4], an ungrateful shithead, cheat me." (Ex. A at 420.) Gao went on to explain that while "that shitty kid, he was beaten [by the "black guys"] twice" . . . "I was very unhappy about it." He again complained that the prior beatings had not been to his satisfaction: "I requested for his legs to be broken in half. Fuck, two days after the beating, he went back to do nails. Nothing happened to him. What kind of job was done by them?" (Ex. A at 426.) He also instructed CW1 to "break his legs for me. Break them in half . . . break his legs – $5,000 from me." (Ex. A at 423.)

11.    <u>2015 Assault</u>

While discussing distributing narcotics and carrying out the 2015 solicitation of an assault on John Doe 4, in April 2015, the defendant requested that CW1 beat another individual with whom the defendant had a dispute:

ZHENG:    Tomorrow when that person comes in, ask the black guys to go to Chinatown to beat this guy!

CW1:    Okay. When?

ZHENG:      Kind of old age.

CW1:      Okay.  You call me.

ZHENG:      In Bronx?

CW1:      Yes.  You call me one or two days in advance.

ZHENG:      Let me check out the person in Bronx.  I will point out the person for you.  You can go with me.  I will point out the person for you.

CW1:      That person owns a restaurant?

ZHENG:      Yes.

CW:      Okay.  Sure.

ZHENG:      Got to do something.  If there is nothing to do, then it is not going to solve the problem.

(Ex. A at 305 – 306.)

### 12.    Naturalization Fraud

The defendant became a United States citizen on September 27, 2011.  Since at least 2008, Zheng distributed ketamine on numerous occasions.  As discussed at the trial of Jiyao Jiang, the defendant also participated in alien smuggling prior to his naturalization.  During his naturalization interview in on his citizenship application, the defendant explained that he had never committed a crime or offense for which he was not arrested; had never sold or smuggled controlled substances, illegal drugs or narcotics and had never helped anyone enter or try to enter the United States illegally.  Each of these statements was false.

### 13.    Tax Fraud Conspiracy

Even while in prison the defendant has continued to engage in criminal activity.  Specifically, he and his wife have engaged in a tax fraud conspiracy.  Their plan was recorded by the prison telephone system.  For instance, the following conversation took place on January 30, 2016:

ZHENG:    You . . . the taxes need to be filed under a restaurant.

CHEN:     Taxes, right.  I should get tax refunds this year, right?  Yeah?

ZHENG:    To report . . . Would it be doable to file under Da Ji's place?  Who would be able to file it for us?

CHEN:     To take it where?

ZHENG:    At Da Ji's place.

CHEN:     Oh, you are telling me to file income taxes.

ZHENG:    Yeah.

CHEN:     Can I file it under my older brother's place?

ZHENG:    That's fine.  Your brother's place can file it.

CHEN:     So I need to file taxes this year, file as a family.  Because last year . . . now that you are inside, I can file it for you for the past year, right?

ZHENG:    Yeah.

CHEN:     File as a family . . . where did you file it?

ZHENG:    There's nothing to file.  I file under MingAn.[6]  The taxes from MingAn . . . the federal taxes are not enough.

                              . . .

CHEN:     What would happen if I don't file my taxes?

ZHENG:    If you don't file, the Medicaid would be problematic.

CHEN:     Oh.  So I should file just over $10,000 at my brother's place?

ZHENG:    Just over $10,000.  Yeah.  It doesn't matter if there's a tax refund or not.

                              . . .

_____

[6]     Ming An was the defendant's bus company that was closed by the Department of Transportation in 2013 for numerous violations.  (See PSR ¶ 172.)  As the company closed in 2013, the defendant would not have been permitted to file taxes for the company for 2014 or 2015.

23

CHEN:        So I need to purchase taxes?

ZHENG:       Yeah.

                               . . .

CHEN:        Would it be too late to purchase taxes now?  Are there still W-2 available?

ZHENG:       There are.  That's always available.

CHEN:        Yeah?

ZHENG:       You can buy it now.  As long as there's no tax refund.  Don't get a refund out
             of it.  That's okay.

(Exhibit D at 3 – 5.)

            The defendant and his wife again discussed purchasing W-2 forms to file
fraudulent tax returns on February 5, 2016:

CHEN:        I am going to purchase taxes now.  It'll cost $1,700.  It'll cost  $1,700 but we
             can receive $5,000 to $6,000 in refunds.

ZHENG:       That's fine.  Sure.

CHEN:        I am going to buy it now.  To buy it . . . someone . . . Hong Hong is buying it
             for me.

ZHENG:       Okay.

CHEN:        Don't . . . you don't need to call Mr. Ho now.

ZHENG:       Okay.

(Ex. D at 6.)

            On February 10, 2016, the conversation about tax fraud continued:

CHEN:        I said I would bring the W-2 to you for your calculation.  I asked approximately
             how much refund.  He asked if we want tax refunds.  I said we do.  Of course
             we want tax refund.  We have nothing now, right?

ZHENG:       Yeah.

CHEN:        I said I do want tax refunds.  I asked approximately how much refund we can

                               24

get for a family of four. He said we can get about $7,000 to $8,000 in tax refunds. He said if we report about $15,000 we can get $7,000 to $8,000 in refunds. I said to get $7,000 to $8,000 in refund . . . I said I had to go over there and purchase taxes . . .

ZHENG:      Don't talk about this.

CHEN:       There is no more. . . he doesn't have it any more. He doesn't have any W-2 available anymore. He said I'll calculate it for you if you bring me the W-2.

As noted in the PSR, the defendant is in Criminal History Category I. This, however, understates his prior criminal history. The degree to which the defendant was able to escape punishment for his crimes over such an extended period of time is the result, in large part, of victims' fear instilled in the community through many acts of intimidation and violence. This fear caused victims to avoid seeking out or cooperating with law enforcement and, until the present prosecution, prevented the defendant from being brought to justice.

As demonstrated by the above-referenced conduct, the defendant has engaged in extensive criminal conduct.[7] None of these crimes affect the defendant's Guidelines offense level, but are relevant in understanding the terror that the defendant inflicted on the community for a number of years. The defendant's history of violence and his disregard for the law exemplify a lack of concern for societal norms and support a sentence at the high end of the Guidelines range. United States v. Rosenberg, 423 F. App'x 54, 56 (2d Cir. 2011) (upholding high-end of the Guidelines sentence where the district court considered all Section 3553(a) factors and found that, among other things, the defendant's "unpredictable dangerous nature [and] violent criminal history" warranted such a sentence) (internal quotation marks omitted); United States v. Martinez, 277 Fed. Appx. 98, 99 (2d Cir. 2008) (upholding high-end of Guidelines sentence where the court relied upon defendant's "'violent criminal history,'" and the 'obvious need to protect the public from [Martinez's] further violent crimes.'") (alteration in original).

---

[7]        The defendant, CW1 and CW2 repeatedly spoke about how CW1 and CW2 would use "black guys" to carry out the defendant's many assaults. On multiple occasions, the defendant informed CW1 that he had previously had his own stable of "black guys" that he used for criminal purposes. (See e.g., Ex. A at 124 (Zheng "You know, back in the days, I had a whole crew of black guys in East New York, you know? Back in the days, I always used black guys to get things done, you know?").) As such, it appears that in addition to the numerous crimes discussed herein, the defendant may have previously others to commit other crimes for him.

25

Under these circumstances, the defendant's request for a below-Guidelines sentence is far too lenient and should be rejected by the Court. The severe nature of the defendant's crimes, the need to adequately punish the defendant, the need to provide adequate deterrence to the defendant and others who would contemplate similar crimes, and the interests in protecting the public from future crimes of the defendant all warrant the imposition by the Court of a sentence at the top of the Guidelines range.

VI.     Conclusion

       For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the top of the Guidelines range.

                         Respectfully submitted,

                         BRIDGET M. ROHDE
                         Acting United States Attorney

By:     /s/
                         Nadia E. Moore
                         Maria Cruz Melendez
                         Assistant U.S. Attorneys
                         (718) 254-6362/6408

cc:    James Kousourous, Esq.
       Counsel to Defendant

       Ms. Cheryl M. Fiorillo
       U.S. Probation Officer

33